UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANTONIO EDWARDS, also known as "Rayduce Rashad", and "Rodney Bell" | No. 18 CR 45-01<br><br>Judge Elaine E. Bucklo |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits its sentencing memorandum and asks the Court to sentence defendant ANTONIO EDWARDS to a term of imprisonment at the low end of the applicable Sentencing Guidelines range of 356 months – 188 months concurrently on Counts 1, 2, 6 and 8, 84 months consecutively on Count 7, and 84 months consecutively on Count 9. In addition, the government requests that this Court impose a three-year term of supervised release as to Counts 1, 2, 6, and 8, concurrent to a four-year term of supervised release as to Count 7 and 9, which include the conditions specified prior to paragraph 164 of the Presentence Investigation Report ("PSR"). Such a sentence is reasonable upon consideration of the relevant sentencing factors set forth in 18 U.S.C. § 3553(a). More specifically, and as detailed below, such a sentence would be sufficient, but not greater than necessary, to punish defendant for the offenses of conviction, deter him from committing additional criminal conduct, and protect the public from further crime.

1

## I.   Background

### A.   The Offense Conduct

As described in the Presentence Investigation Report ("PSR"), and the Government's Version of the Offense:

#### i.   <u>**With Respect to Count 1 of the Superseding Indictment**</u>

On Beginning no later than March 29, 2017, and continuing until on or about May 28, 2017, EDWARDS, Andrew McHaney, and James Bates conspired with each other, and with others known and unknown, to rob cellular telephone stores throughout the Northern District. As part of the conspiracy EDWARDS, McHaney, Bates, and others known and unknown, agreed to rob various cellular telephone stores in the Northern District of Illinois. It was further part of the conspiracy that the defendants: (a) obtained, possessed, and brandished a firearm in connection with the commission of armed robberies; (b) bound and restrained their victims during the robberies; (c) used cellular telephones to communicate with one another while planning and committing armed robberies; (d) used vehicles for transportation to and from the location of armed robberies; (e) concealed their identifies by wearing hoods, hats, masks, gloves, and other items; (f) traveled to various cellular telephone stores to conduct surveillance; and (g) robbed cellular telephone stores of cellular telephones, tablet computers, and United States currency at gunpoint. It was further part of the conspiracy that EDWARDS, McHaney, Bates, and other known and unknown, did conceal and hide, and caused to be concealed and hidden, the purposes of acts done in furtherance of the conspiracy.

As part of this conspiracy, and as further detailed below, EDWARDS robbed the following cell phone stores:

- The T-Mobile store located at 5601 S. Harlem, in Chicago on March 29, 2017
- The Verizon store located at 754 N. Green Bay Rd., in Waukegan on April 25, 2017
- The AT&T store located at 940 N. Kinzie in Bradley on April 30, 2017

In addition, as part of this conspiracy, EDWARDS's co-conspirators, McHaney and/or Bates, participated in the below detailed robberies, with others known and unknown:

1. **Robbery of the Sprint store at 201 North Genesis Drive B, in North Aurora on April 5, 2017**

On or about April 5, 2017, at approximately 7:13 p.m., Bates and Individual D robbed the Sprint Store, located at 201 North Genesis Drive B, in North Aurora. During the robbery, Individual D entered the store and approached Employees G and H at the sales counter. Shortly thereafter, Bates entered the store, wearing latex gloves, and locked the front door while Individual D pulled out and brandished a handgun and announced a robbery. Bates and Individual D then forced Employees G and H into the back room of the store where Bates tied Employee H's hands together. Individual D took Employee G back out to the sales counter, took several Sprint tablet computers, and returned to the back room with Employee G. Individual D placed the tablets into an orange bag that Bates was carrying and had Employee G open the store safe. Bates then removed numerous cell phones from the safe and placed them into the orange bag and a white garbage bag. Individual D then ordered Employee G into a nearby bathroom and Employee H into an adjacent office, at which time Bates

3

and Individual D exited out the back of the store with the cell phones and the computer tablets. In total, Bates and Individual D took approximately 22 cell phones and 4 computer tablets worth approximately $13,722.

### 2. Robbery of the Verizon store at 905 East Rand Rd., in Mount Prospect on April 13, 2017

On or about April 13, 2017, at approximately 3:30 p.m., Bates, McHaney, and Stephanie Edwards[1] robbed the Verizon Store, located at 905 East Rand Road in Mount Prospect. Immediately prior to the robbery, Stephanie Edwards conducted surveillance inside of the Verizon store before Bates and McHaney entered. Stephanie Edwards subsequently exited the Verizon store and served as a lookout with other accomplices, including Individual E, while Bates and McHaney conducted the robbery.

During the robbery, McHaney pulled out, racked, and brandished a handgun and announced a robbery, forcing Employees I and J to the back stock room of the store at gunpoint and while pushing the gun into the back of Employee I. At the same time, Bates put on gloves, locked the front door of the store, and relocated to the back stock room where he met up with McHaney and Employees I and J. Once inside the stock room, Bates bound the hands of Employees I and J with duct tape and loaded several boxes of cell phones into a garbage bag while McHaney attempted to disable the store surveillance system. Bates and McHaney then exited through the back door of the store, met up with Stephanie Edwards and Individual E, and departed the

---

[1] Stephanie Edwards is the sister of Antonio Edwards.

scene. In total, Bates, McHaney, and Stephanie Edwards took 28 cell phones worth approximately $20,355.

      **3.    Attempted robbery of the Verizon store at 17575 South Halsted in Homewood on May 28, 2017**

On May 28, 2017, at approximately 4:30 p.m., Bates, McHaney, and Individual F attempted to rob the Verizon Store, located at 17575 South Halsted, in Homewood. More specifically, Bates drove McHaney and Individual F to the parking lot outside of the Verizon Store in a black Kia Soul ("Subject Vehicle 2") with the intention of robbing the store, and circled the parking lot several times before parking near the Verizon Store. Law enforcement then approached Subject Vehicle 2 and arrested Bates, McHaney and Individual F. At the time of the arrest, McHaney possessed in his waistband a loaded Kahr PM9 nine-millimeter semi-automatic handgun, bearing serial number IB5840, and Individual F was wearing latex gloves. Inside of Subject Vehicle 2 were items to use in the planned robbery of the Verizon Store, including a second pair of white latex gloves, one roll of duct tape, one burgundy hooded sweatshirt,[2] and one white bag with red stripes.

      **ii.    <u>With Respect to Count 2 of the Superseding Indictment</u>**

On or about March 29, 2017, at approximately 5:29 p.m. EDWARDS, McHaney, and Individual A robbed the T-Mobile Store, located at 5601 South Harlem in Chicago. More specifically, immediately prior to the robbery, Edwards entered the

---

[2] Based upon a review of surveillance video footage, this burgundy hooded sweatshirt appeared to be the same or similar to the burgundy hooded sweatshirt worn by McHaney during the robbery of the T-Mobile store in Chicago on March 29, 2017.

5

T-Mobile store by himself, walked up to the sales counter where Employee A and Employee B were working, and inquired about pre-paid phones. Moments later, Individual A entered the store and walked up to the sales counter. While EDWARDS and Individual A were at the sales counter, McHaney entered the store and locked the front door from the inside. EDWARDS and Individual A then briefly turned around and looked at McHaney, before turning back towards Employees A and B. EDWARDS then announced a robbery as Individual A pulled out a gun and pointed it at Employee A. Employees A and B were then led to the back office of the store by all three offenders, as Individual A continued to point the gun at Employee A.

In the back office, EDWARDS directed Employee A to open the safe and Employee A complied. McHaney then began to place cell phones into a black garbage bag while Individual A continued to point the gun at Employee A. While McHaney emptied the safe and Individual A continued to point the gun at Employee A, EDWARDS took Employee B back out to the sales counter and tried to get her to open the cash register. When she was unable to do so, EDWARDS took the entire cash drawer with him, and escorted Employee B to the rear of the store where EDWARDS unsuccessfully tried to open the cash drawer. The offenders then demanded to see where the store surveillance system was located. Employee A and B then pointed out an adjacent rear storage room, where the offenders pulled down the cabinet where the store surveillance system was located. All three offenders fled out the rear of the store and into the alley at which time the offenders got into a waiting getaway car.

In total EDWARDS, McHaney, and Individual A stole approximately 23 cellular telephone, worth an undetermined amount of money.

### iii. With Respect to Counts 6 and 7 of the Superseding Indictment

On or about April 25, 2017, at approximately 5:41 p.m., EDWARDS, Individual B, and Individual C robbed the Verizon Store, located at 754 North Green Bay Road, in Waukegan. Furthermore, EDWARDS knowingly used, carried, and brandished a firearm during and in relation to this robbery. More specifically, during the robbery EDWARDS entered the store, looked at merchandise, and was assisted by Employee C. A short time later, Individual B entered the store and also looked around the store at merchandise before Individual C entered the store. When Individual C entered the store, EDWARDS removed a gun from his waistband, racked it, and pointed it at the store employees while announcing a robbery. EDWARDS and Individuals B forced Employees C, D, and E to a back area of the store, while Individual C locked the front door of the store before joining EDWARDS and Individual B in the back of the store.

In the back area of the store, Individual B took Employee C to a separate back room where the store safe was located. Upon arriving in this office, Individual B forced Employee C to open the safe while EDWARDS continued to brandish a firearm and keep watch over Employees C, D, and E. Once the safe was open, Individual B placed cell phones, tablets, and accessories from the safe into black garbage bags. After Individual B filled up the black garbage bags with cell phones and tablets EDWARDS, and Individuals B and C exited through the back door of the store and departed the scene with the aforementioned store merchandise.

In total, EDWARDS, and Individuals B and C stole 100 cell phones and tablets worth approximately $70,734.91.

### iv. With Respect to Counts 8 and 9 of the Superseding Indictment)

On or about April 30, 2017, at approximately 5:45 p.m., EDWARDS, Bates, and McHaney robbed the AT&T Store, located at 900 North Kinzie, in Bradley, Illinois. More specifically, immediately prior to the robbery, Employee C was about to close the store when EDWARDS and McHaney entered the store, walked up to the sales counter, and inquired about a phone. Employee C tuned his back to EDWARDS and McHaney in order to show them a phone when he heard the sound of a pistol being "racked." Employee C turned back around saw McHaney pointing a handgun at him and heard McHaney announce a robbery. McHaney then escorted Employee C to the back of the back office of the store at gunpoint while EDWARDS, who was wearing gloves, locked the front door of the store. After locking the door, EDWARDS ran to the back office of the store where he joined McHaney and Employee C.

The back office of the store led to a locked secured room where phones and tablets were stored. Upon reaching the locked door of the secured room, McHaney placed the gun to Employee C's head while EDWARDS reached into Employee C's pants pocket and retrieved the keys to the secured room and opened it. Once inside the secured room, EDWARDS placed numerous cell phones into two black garbage bags. In the meantime, McHaney attempted to disable the store security system before tying Employee C's hands and feet together with a power cord.

After a few minutes, EDWARDS, who was wearing gloves, exited the secured room with two full black garbage bags of cell phones. McHaney then continued to try to disable the store security system and make sure that Employee C was secured in his restraints, while EDWARDS relocated to the front of the store and removed a cash register till, which EDWARDS then brought to the back of the store. McHaney eventually handed the firearm off to EDWARDS and EDWARDS briefly brandished the gun at Employee C before exiting the rear emergency door of the store with the two black garbage bags containing cell phones and placed the two bags into a black four-door Toyota Corolla, which was being driven by Bates and which was registered to Bates' aunt ("Subject Vehicle 1"). In the meantime, McHaney continued to secure Employee C on the floor in the back room of the store. A short time later, McHaney followed EDWARDS out the back door; however, both men soon returned, during which time EDWARDS again brandished the gun while both McHaney and EDWARDS took the cash from the previously referenced register till. After taking the cash, McHaney and EDWARDS left out of the back emergency door of the store with the cash and entered Subject Vehicle 1. Bates then drove all three away from the scene.

In total, EDWARDS McHaney, and Bates took 61 cell phones worth approximately $41,205 belonging to, and in the custody, care, and control of the AT&T Store.

## II. PSR Offense Level, Criminal History, and Guideline Calculations

### A. <u>Offense Level Calculations in the PSR</u>

Counts 1, 2, 6 and 8 are not grouped for guideline calculation purposes. USSG §3D1.2.

The probation officer calculated and the government concurs defendant's offense level as follows: Counts 7 and 9, brandishing a firearm during a crime of violence, requires a seven-year term of custody, to run consecutive to any other sentence. Therefore, there are no guideline calculations provided for Counts 7 and 9. USSG §2K2.4(b) and 18 U.S.C. 924(c)(1)(A)(ii), PSR ¶¶ 76, 89.

The probation officer calculated and the government concurs, that a conviction on a count charging a conspiracy to commit more than one offense shall be treated as if EDWARDS had been convicted on a separate count of conspiracy for each offense that EDWARDS conspired to commit. USSG §1B1.2(d). PSR ¶ 46. The probation officer assessed, and the government concurs, that there was a preponderance of evidence that, in addition to the robberies charged in Counts 2, 6, and 8, that EDWARDS was accountable for the robberies that occurred on April 5, 2017 at the Sprint Store in North Aurora and April 13, 2017 at the Verizon Store in Mount Prospect. PSR ¶ 46 Therefore, the probation officer's guideline calculations reflected for each of the five robberies in which EDWARDS was involved. PSR ¶ 46

It is also the probation officer's position that EDWARDS not be held accountable for the May 28, 2017, attempted robbery of the Verizon store in Homewood, as part of the conspiracy charged in Count One. PSR ¶ 47 More

specifically, according to the probation officer, EDWARDS was detained on separate state charges at the time of the May 28th attempt robbery and there was no evidence indicating that EDWARDS engaged in conduct in furtherance of that criminal activity on May 28, 2017. Upon further consideration, the government does not object to this conclusion and agrees with the probation officer.

> i. **Count 1(a): April 5, 2017 Robbery – Sprint, North Aurora**
>
> 20    Base Offense Level. See USSG §2B3.1(a).
> +5    Firearm was brandished during the robbery. See USSG § 2B3.1(b)(2)(C).
> +2    A person was physically restrained to facilitate the commission of the offense. See § 2B3.1(b)(4)(B).
> 27    Adjusted offense level.
>
> PSR ¶¶ 48-55.
>
> ii. **Count 1(b): April 13, 2017 Robbery – Verizon, Mount Prospect**
>
> 20    Base Offense Level. See USSG §2B3.1(a).
> +6    Firearm was otherwise used during the robbery. See USSG § 2B3.1(b)(2)(B).
> +2    A person was physically restrained to facilitate the commission of the offense. See § 2B3.1(b)(4)(B).
> +1    The amount of loss for which defendant is accountable, $20,355, exceeded $20,000 but was less than $95,000. See USSG §2B3.1(b)(7)(B)
> 29    Adjusted offense level.
>
> PSR ¶¶ 56-63.
>
> iii. **Count 1(c) and 2: March 29, 2017 Robbery – T-Mobile, Chicago**
>
> 20    Base Offense Level. See USSG §2B3.1(a).
> +6    Firearm was otherwise used during the robbery. See USSG § 2B3.1(b)(2)(B).
> 26    Adjusted offense level.

PSR ¶¶ 64-69.

### iv. Counts 1(d) and 6: April 25, 2017 Robbery – Verizon, Waukegan

| | |
|---|---|
| 20 | Base Offense Level. See USSG §2B3.1(a). |
| +1 | The amount of loss for which defendant is accountable, $70,734.91, exceeded $20,000 but was less than $95,000. See USSG §2B3.1(b)(7)(B) |
| 21 | Adjusted offense level.[3] |

PSR ¶¶ 70-75.

### v. Counts 1(e) and 8: Robbery – AT&T, Bradley

| | |
|---|---|
| 20 | Base Offense Level. See USSG §2B3.1(a). |
| +2 | A person was physically restrained to facilitate the commission of the offense. See § 2B3.1(b)(4)(B). |
| +1 | The amount of loss for which defendant is accountable, $52,469, exceeded $20,000 but was less than $95,000. See USSG §2B3.1(b)(7)(B). |
| 23 | Adjusted offense level.[4] |

PSR ¶¶ 82-88.

### vi. Multiple Count Adjustment

- Count 1(a) has an adjusted offense level of 27 and is 2 level less serious than Count 1(b). Therefore, that group is assigned 1 unit, pursuant to Guideline § 3D1.4(a).
- Count 1(b) has an adjusted offense level of 29. That group is assigned 1 unit, pursuant to Guideline § 3D1.4(a).
- Count 1(c) and 2 has an adjusted offense level of 26 and is 3 levels less serious than Count 1(b). Therefore, that group is assigned 1 unit, pursuant to Guideline § 3D1.4(a).

---

[3] Pursuant to Application Note 4 to Guideline § 2K2.4, the enhancement in Guideline § 2B3.1(b)(2) does not apply because defendant is subject to a statutory consecutive sentence under 18 U.S.C. § 924(c)(1)(A)(ii).**Error! Main Document Only.**

[4] Pursuant to Application Note 4 to Guideline § 2K2.4, the enhancement in Guideline § 2B3.1(b)(2) does not apply because defendant is subject to a statutory consecutive sentence under 18 U.S.C. § 924(c)(1)(A)(ii).**Error! Main Document Only.**

- Count 1(d) and 6 has an adjusted offense level of 21 and is 8 levels less serious than Count 1(b). Therefore, that group is assigned .5 units, pursuant to Guideline § 3D1.4(b).
- Count 1(e) and 8 has an adjusted offense level of 23 and is 6 levels less serious than Count 1(b). Therefore, that group is assigned .5 units, pursuant to Guideline § 3D1.4(b).
- Counts 7 and 9 are each assigned 0 units

PSR ¶ 95.

According to the PSR, the Total number of units is 4. PSR ¶ 95. Pursuant to USSG § 3D1.4, when the number of units is 4, then 4 levels are added to the offense level. PSR ¶ 97 Therefore, the combined adjusted offense level is 33. PSR ¶ 98. Defendant receives a no reduction in his offense level for acceptance of responsibility pursuant to USSG §3E1.1(a)(b). PSR ¶ 100. As a result, defendant's total offense level is 33. PSR ¶ 101. The government agrees with, and has no objections to, the offense level calculation in the PSR.

### B. Criminal History Points Calculation in the PSR

The PSR found that the defendant had 8 criminal history points and a criminal history category of IV. PSR ¶¶ 106-112. The government agrees with, and has no objections to, this calculation.

### C. Guidelines Calculation in the PSR

With an offense level of 33 and criminal history category of IV, defendant's advisory guidelines range for Counts 1, 2, 6 and 8 is 188 to 235 months. PSR ¶ 158. In addition, with regard to Counts 7 and 9, the minimum term of imprisonment is 84 months and the maximum term is life on each count. PSR ¶ 157. Moreover, the term of imprisonment imposed on each of Counts 7 and 9 must be imposed consecutively

13

to any other counts. PSR ¶ 157. The government agrees that this is the correct advisory Guidelines range.

### III. The Factors Set Forth in 18 U.S.C. § 3553(a) Warrant a Combined Guideline Sentence of 356 months

A sentence of 356 months' imprisonment—188 months concurrently on Counts 1, 2 6, and 8, 84 months consecutively on Count 7, and 84 months consecutively on Count 9, which is at the low end of the applicable Sentencing Guidelines range—is appropriate in this case where the § 3553(a) factors—particularly, the seriousness of the offenses, defendant's personal history and characteristics, and the need to protect the public, promote respect for the law, and provide just punishment—weigh in favor of such a sentence.

As noted in the Sentencing Recommendation of the Probation Officer, "In consideration of the instant offenses, it is impossible to overstate the seriousness." SR 2. Here, over the course of roughly one month from late March of 2017, until May of 2017, defendant and his accomplices engaged in a terrifying crime spree that left numerous victims in its wake. More specifically, on numerous occasions throughout that two month period, defendant, along with his known and unknown co-defendants, entered cell phone stores throughout the Chicagoland area and robbed these stores while armed each time with a firearm. In nearly every instance, defendant and his accomplices entered the stores, announced a robbery, locked the front door of the store from the inside, and then herded the store employees and any remaining customers into a back office at gunpoint. Once in the back office, an employee would be forced to open a store safe and defendant and his accomplices would help themselves to cell

phones and tablets belonging to the store. As the store safes were being emptied, the store employees and any remaining customers would be tied up with restraints, which often included duct tape, before defendant and his cohorts would make good their escape out the back door of the store to a waiting getaway car.

In each instance, the employees and customers were simply either working or shopping on what should have been a typical day, unaware of the terror they were about to encounter. In a split second, defendant and his accomplices would strike fear into the hearts of those they encountered by pulling out a gun, announcing a robbery, and leading their victims to the back of a cell phone store to await an uncertain fate. As demonstrated by the events surrounding Counts 1, 2, 6, 7, 8, and 9, defendant's actions, and those of his accomplices, created shock, fear, and emotional distress for these innocent victims left in defendant's wake. This combustible mix of defendant and his cohorts brandishing a firearm, restraining their victims, and pressed for time while trying to empty store safes before law enforcement could arrive, particularly involving someone with defendant's criminal history, was a potential recipe for disaster. As a result, the sentence imposed by this Court must adequately recognize the seriousness of, and provide just punishment for, these offenses.

Moreover, as referenced in the sentencing recommendation, not only were defendant's actions in these robberies alarming, so too is his criminal history, as well as his repeated and consistent failure to comply with the conditions of location monitoring, including the commission of new offenses (in other states no less) while on pretrial release.

As noted, defendant's criminal history began over a decade ago in 2008 when he was adjudicated a delinquent minor at the age of 14 for aggravated battery and robbery. PSR ¶ 106. His criminal conduct then continued into adulthood where he sustained two additional convictions for residential burglary in 2012 and attempted residential burglary in 2017. PSR ¶¶ 107-08. In addition, in relation to his 2012 conviction, after defendant was initially released to parole on April 18, 2013, he violated his conditions of parole and was re-admitted to the Illinois Department of Corrections on three occasions: specifically on July 1, 2013 (re-released on August 28, 2013); June 23, 2014 (re-released to parole July 15, 2014); and September 19, 2014 (sentence discharged November 14, 2014). Moreover, in relation to his 2017 conviction for attempted residential burglary, four motions for violations of probation were filed after he was initially sentenced to 30 months of intensive probation on January 24, 2017, and a mere two months after this probationary sentence, defendant began the crime spree for which he finds himself before this court.

Furthermore, while defendant was supposed to be abiding by the terms of location monitoring while on pre-trial release in the instant case, defendant instead sustained three news arrests, one of which resulted in a conviction. More specifically, receiving/concealing stolen property from Berrien County, Michigan from August 14, 2019; resisting a peace officer from Racine County, Wisconsin from on or about October 7, 2019; and tampering with an electronic monitoring device and absconding or forfeiting bond, also from Berrien County, which resulted in a conviction on

January 20, 2020 and resulted in terms of imprisonment of 92 days and 180 days, respectively. PSR ¶¶ 109, 132-33.

In summary, the crimes which defendant committed are very serious and his actions jeopardized the lives of innocent citizens and contributed to an unacceptable level of violence in this district. As reflected by defendant's prior conduct, as well as his actions in each of these robberies, defendant exercises little hesitation when it comes to taking what is not his, or in putting others at risk of grave harm when doing so. Moreover, defendant's criminal history shows that the current offenses are part of an ongoing and escalating pattern of criminal behavior, and that his prior interactions with the criminal justice system, including his stint on pre-trial release in this case, have done little to deter him from committing additional crimes. Consequently, the public requires protection from defendant and the sentence of this Court should reflect this concern.

While it may have been appropriate to show leniency earlier on in his criminal career, at the present time the severity and frequency of defendant's criminal history, the seriousness of the offenses, and his high rate of recidivism justify and warrant a combined sentence of 356 months – 188 months concurrently on Counts 1, 2, 6 and 8, 84 months consecutively on Count 7, and 84 months consecutively on Count 9. Moreover, such a sentence will send an appropriate message to defendant, and other similarly situated felons, that the threat posed by violent crime, and in particular violent crime that utilizes firearms, is serious and will not be tolerated in this District.

## IV. Restitution

Regarding restitution as to Count 6, the total amount of restitution owed to Hector Acosta, DBA as Verizon, is $70,734.91, minus any credit for funds repaid prior to sentencing. Pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make full restitution in the amount outstanding at the time of sentencing.

Regarding restitution as to Count 8, the total amount of restitution owed to AT&T is $41,205, minus any credit for funds repaid prior to sentencing. Pursuant to Title 18, United States Code, Section 3663, the Court must order defendant, together with co-defendants Andrew McHaney and James Bates, with whom defendant is jointly liable, to make full restitution in the amount outstanding at the time of sentencing.

Regarding forfeiture, the government requests that the following specific property be forfeited to the United States: (1) a Kahr PM9 nine-millimeter semi-automatic handgun, bearing serial number IB5840, and associated ammunition.

## V. Supervised Release Conditions

The government requests that the Court impose a term of supervised release of three-years as to Counts 1, 2, 6, and 8, concurrent to a four-year term of supervised release as to Counts 7 and 9, which include the conditions specified prior to paragraph 164 of the PSR.

**VI.  Conclusion**

For the reasons set forth above, the government respectfully requests that the Court impose a term of imprisonment at the low end of the applicable Sentencing Guidelines range of 356 months – 188 months concurrently on Counts 1, 2, 6 and 8, 84 months consecutively on Count 7, and 84 months consecutively on Count 9. Furthermore, the government also respectfully requests the imposition of the proposed terms of supervised release.

        Respectfully submitted,
        JOHN R. LAUSCH, JR.
        United States Attorney

By: *Aaron R. Bond*
        AARON R. BOND
        KRISTEN TOTTEN
        Assistant United States Attorneys
        219 S. Dearborn Street, Fifth Floor
        Chicago, Illinois 60604
        (312) 353-5300

Dated: November 13, 2020